IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | |
|---|---|
| JAMES LEE CECIL, JR. ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 7:20-cv-349 |
| ) | |
| GREGORY WINSTON, JOHN ) | By: Elizabeth K. Dillon |
| BOWMAN, KEITH FLEEMAN, ) | United States District Judge |
| THOMAS BOBBIT, KEVIN JONES, ) | |
| and ARTHUR PALMER, ) | |
| ) | |
| Defendants. ) | |

**MEMORANDUM OPINION**

Pending before the court is defendants' motion to dismiss for failure to state a claim upon which relief can be granted. (Dkt. No. 28.) The court held a hearing on this motion, and the matter has been fully briefed. For the reasons stated below, the court will grant in part and deny in part defendants' motion to dismiss.

I.  BACKGROUND

**A.  Factual Background**

Plaintiff James Lee Cecil, Jr. is incarcerated at the New River Regional Jail (NRVRJ) in Dublin, Virginia. (2d Am. Compl. 2, Dkt. No. 27.) Defendants are employees of the New River Regional Jail Authority. Gregory Winston is the superintendent, John Bowman is the deputy superintendent, Keith Fleeman is a major and director of security, Thomas Bobbitt is a captain, and Kevin Jones and Arthur Palmer are sergeants. (*Id.* at 4–8.)

### *1.  Cecil's Arrival at NRVRJA*

On November 4, 2019, Cecil was transferred from the Southwest Regional Jail Authority to the NRVRJ. (*Id.* at 8.) Upon his arrival at the NRVRJ, "all of the legal mail, legal papers, and

1

legal books . . . in [] Cecil's possession were confiscated from him," and he was told that NRVRJ "does not like jailhouse lawyers." (*Id.* at 2, 9.) Cecil was housed in an intake pod, while the NRVRJ determined his security classification. (*Id.* at 8.) While in the intake pod, "Cecil submitted several good faith attempts, pursuant to the NRVRJA's request procedure, to retain his personal property . . . [but] Cecil's request forms either did not get returned to him, or he did not get a helpful response." (*Id.* at 9.)

On December 9, 2019, Cecil was classified as a minimum-security inmate and placed in pod F-103 ("F-block"), which houses minimum security inmates. (*Id.* at 9.) On December 18, 2019, Cecil filed a warrant in detinue to retrieve his personal property from the NRVRJA, specifically his legal and educational materials. (*Id.* at 10.) On December 25, 2019, Sergeant Crotts returned to Cecil the personal property at issue. (*Id.*)

### 2. *Cecil's Medical Problems*

Cecil reports issues receiving medical care at the NRVRJ. Cecil is currently infected with Hepatitis C, and he claims that Deputy Superintendent Bowman and Nurse Practitioner Mary Cox refuse to provide him with curative treatment. In January 2020, Cecil filed suit against Bowman and Cox related to this lack of medical treatment. (*Id.* at 10.)

Cecil also suffers from dental problems. In January 2020, Cecil "submit[ed] a request form to the medical department to have [a] tooth extracted [and] the medical department responded that it may be several months before [] Cecil could have the tooth removed." (*Id.* at 11.) After weeks of severe pain, Cecil "attempted to use AAA battery acid to kill the nerve in the tooth." (*Id.*) He also wrote a letter to Superintendent Winston, explaining his pain and dental issue, and seeking medical attention. (*Id.*)

### *3. Cecil the Paralegal*

In January 2020, Cecil received his legal assistant/paralegal certification from the Blackstone Career Institute. (*Id.* at 11.) Cecil has used his education to assist other inmates with legal issues and to help them with their G.E.D. homework. (*Id.* at 11, 18.)

In December 2019, inmate Daniel Allen Cooper Jr. noticed that Cecil was studying a paralegal book. (*Id.*) Cooper asked Cecil for assistance in filling out "a 1983 form" to file suit under 42 U.S.C. § 1983. (*Id.*) Cecil helped Cooper complete the 1983 form, write a letter to Deputy Superintendent Bowman, and file the form with the letter. (*Id.* at 11–12.) In the letter to Bowman, Cecil explained that Cooper was seeking a transfer "to a Department of Corrections (DOC) facility, and upon transfer[,] the NRVRJA would not have to hire an attorney to file an answer." (*Id.* at 12.)

On March 2, 2020, Cecil provided legal assistance to another inmate, Jackson Ellis Parrish. (*Id.*) Parrish "was diagnosed as severely depressed and ha[d] been denied his depression medicine since being detained in the NRVRJA." (*Id.*) Cecil helped Parrish prepare a state civil action form to address this medical issue. (*Id.*)

### *4. Cecil in Segregation*

On March 4, 2020, Officer Lowe ordered Cecil to pack his belongings and informed him that he would be moving to pod D-109 ("D-block"). (*Id.* at 13.) D-block is a segregation unit where many sex offenders are housed. (*Id.*) Pursuant to page 10(d) of the inmate handbook, Cecil appealed his transfer to segregation, but he never received a judgment on the appeal. (*Id.* at 14.) "Following the non-reply to Mr. Cecil's appeal, Mr. Cecil began the grievance process." (*Id.*)

On March 16, 2020, Deputy Superintendent Bowman spoke with Cecil concerning the grievance and allegedly threatened Cecil with harsher living conditions if Cecil pursued the grievance. (*Id.*) "As a result, Mr. Cecil terminated the [grievance] process." (*Id.*)

On May 15, 2020, Sergeant Palmer told Cecil to pack his belongings and move from pod D-109 to D-110. (*Id.*) D-110 is an isolation pod with only two cells and no security cameras. (*Id.* at 15.) In addition, there are no tables, desks, kiosk machines, or televisions, and there is no interaction with other inmates. (*Id.*) "Palmer told [] Cecil [the transfer] was a decision made by [Deputy Superintendent] Bowman, but [] Palmer did not understand why." (*Id.* at 14.) "On May 29, 2020 Sargent Jones approached Mr. Cecil and said, 'I bet you won't file any more lawsuits will you.'" (*Id.* at 15.)

Cecil submitted request forms asking why he was placed in segregation, and the only response he received was from Captain Bobbitt and Sergeant Jones stating, "D-110 is not Restrictive Housing." (*Id.* at 15.) Further, Cecil claims that Sergeant Jones has said he would put Cecil in general population if it were his decision, "but he has bosses that tell him what to do." (*Id.* at 15.) Cecil claims that in one instance an unspecified sergeant told him, "man I'm worried about you for real, here administration has you housed back herein this dungeon with no witnesses or security cameras . . . I don't understand, you've never given any us problems." (*Id.* at 16–17.)

On May 24, 2020, Cecil again tried to access the grievance procedure. (*Id.* at 17.) Captain "Bobbitt denied Mr. Cecil access to a grievance form stating that 'classification is not grievable,'" and Cecil stated, "I am grieving retaliation, not classification." (*Id.*) On May 29, 2020, Cecil wrote a letter to Superintendent Winston again seeking access to the grievance procedure, but he did not receive a response. (*Id.*)

Cecil asked to be placed "in a pod with access to a desk or table, with security cameras, other inmates, a kiosk, a television." Sergeant Jones and Captain Bobbitt told Cecil he could move to D-107, which is another segregation pod that houses primarily sex offenders. (*Id.*)

## B. Procedural History

On June 18, 2020, Cecil filed suit pursuant to 42 U.S.C. 1983 alleging that all defendants violated his first amendment rights by retaliation.[1] (*Id.* at 21.) Cecil claims that defendants placed him in segregation in retaliation for assisting other inmates with their legal claims and threatened him with harsher living conditions if he used the grievance process or filed additional lawsuits. (*Id.* at 22.) Cecil seeks punitive damages, costs, and attorney's fees. (*Id.* at 22–23.) On December 12, 2020, after obtaining counsel, Cecil filed a second amended complaint. (2d Am. Compl.) The second amended complaint does not contain any of the exhibits attached to the original or first amended complaints. (*Id.*)

On January 8, 2021, defendants filed a motion to dismiss for failure to state a claim.[2] (Dkt. No. 28.) Defendants argue that Cecil does not have a constitutional right to provide other inmates with legal assistance, that there is no causal connection between Cecil's lawsuits and his placement in segregated housing, and Cecil's argument that he was retaliated against for filing a grievance is too vague. (Dkt. No. 29 at 7–10.) Further, even if Cecil has stated a claim for retaliation against Deputy Superintendent Bowman and Sergeant Jones, he does not state a retaliation claim against the other defendants. (*Id.* at 10–13.)

---

[1] Cecil filed his initial complaint and first amended complaint pro se. (Compl.; Dkt. No. 1; Am. Compl., Dkt. No. 3.) The first amended complaint included multiple exhibits. Cecil later obtained pro bono counsel. (Dkt. No. 20.)

[2] Defendants had filed an earlier motion to dismiss (Dkt. No. 7) which the court denied without prejudice to give Cecil's new counsel "an opportunity better frame and/or narrow any claims in the case." (Dkt. No. 21.)

Cecil has filed a response (Dkt. No. 32), and defendants have filed a reply.  On March 25, 2021, the court held a hearing on these motions.  At that time, the parties agreed to dismiss the complaint as to Major Keith Fleeman and Sergeant Arthur Palmer.  (Dkt. No. 37.)

## II.  DISCUSSION

### A.  Standard of Review

Federal Rule of Civil Procedure 12(b)(6) permits a dismissal when a plaintiff fails "to state a claim upon which relief can be granted."  To survive a Rule 12(b)(6) motion, a complaint must contain sufficient "facts to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  "Factual allegations must be enough to raise a right to relief above the speculative level."  *Id.* at 550.  A court will accept all factual allegations in the complaint as true and draw all reasonable inferences in favor of the plaintiff.  *Erickson v. Pardus*, 551 U.S. 89, 94 (2007).  A court need not accept "legal conclusions drawn from the facts," nor "unwarranted inferences, unreasonable conclusions, or arguments."  *E. Shore Mkts., Inc. v. J.D. Assocs. Ltd. P'ship*, 213 F.3d 175, 180 (4th Cir. 2000).  Moreover, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, [will] not suffice."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

In adjudicating a motion to dismiss, a court's review is "generally limited to a review of the allegations of the complaint itself."  *Goines v. Valley Community Servs. Bd.*, 822 F.3d 159, 165–66 (4th Cir. 2016).  "[A court may] also consider documents that are explicitly incorporated into the complaint by reference, *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007), and those attached to the complaint as exhibits, *see* Fed. R. Civ. P. 10(c)."  *Id.*

"As a general rule, an amended pleading ordinarily supersedes the original and renders it of no legal effect."  *Jeffrey M. Brown Assocs., Inc. v. Rockville Ctr. Inc.*, 7 F. App'x 197, 202 (4th Cir. 2001) (quoting *Young v. City of Mount Ranier*, 238 F.3d 567, 572 (4th Cir. 2001)).

6

While a court may not "consider the allegations of the original complaint, . . . [it may] consider certain exhibits attached to the original complaint that are 'integral to and explicitly relied on in the [amended] complaint,' and whose authenticity is not challenged." *Id.* (quoting *Phillips v. LCI Int'l, Inc.*, 190 F.3d 609, 618 (4th Cir. 1999)). "Such exhibits are not superseded if the amended complaint effectively integrates them." *Id.* "Moreover, [] consideration of exhibits that were attached to the original complaint, omitted from the amended complaint, but still referred to, integral to, and relied upon in the amended complaint, furthers the policy of '[p]reventing plaintiffs from surviving a Rule 12(b)(6) motion by deliberately omitting . . . documents upon which their claims are based.'" *Id.* at 202–03 (citing *Parrino v. FHP, Inc.*, 146 F.3d 699, 706 (9th Cir. 1998); *Phillips*, 190 F.3d at 618).

Here, plaintiff's counsel has referenced and incorporated the exhibits from the first amended complaint into the second amended complaint but has inadvertently failed to attach the exhibits to the second amended complaint. Since these exhibits are adequately integrated into the second amended complaint, the court will consider the exhibits attached to the first amended complaint for the purposes of this motion to dismiss.

**B. First Amendment Retaliation**

"To recover damages under 42 U.S.C. § 1983, a plaintiff must show (1) 'the conduct complained of was committed by a person acting under color of state law,' and (2) this conduct deprived a person of rights, privileges or immunities secured by the Constitution or laws of the United States." *Martin v. Duffy*, 977 F.3d 294, 298–99 (4th Cir. 2020) (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 150 (1970)). Here, Cecil argues that defendants violated his first amendment rights by moving him to segregated housing for providing legal assistance to other inmates, filing lawsuits against NRVRJ officials, and using the grievance process. "To state a colorable First Amendment retaliation claim, a plaintiff 'must allege that (1) he engaged in

protected First Amendment activity, (2) the defendant took some action that adversely affected [his] First Amendment rights, and (3) there was a causal relationship between [his] protected activity and the defendant['s] conduct.'" *Id.* at 299 (quoting *Martin v. Duffy*, 858 F.3d 239, 249 (4th Cir. 2017)).

In addition, the Fourth Circuit has held that *Mt. Healthy City Sch. Dist. Bd. of Ed. v. Doyle*, 429 U.S. 274 (1977), "provides the appropriate framework for reviewing inmates' First Amendment retaliation claims." *Martin*, 977 F.3d at 297. *Mt. Healthy* outlines a burden-shifting framework under which a plaintiff establishes a prima facie case of retaliation and then defendant may defeat the claim by proving he would have taken the same action in the absence of the protected conduct. *Id.* at 299 (citing *Mt. Healthy*, 429 U.S. at 283). A defendant "must make this showing by a preponderance of the evidence." *Id.* "If the defendant fails to carry that burden, the inference is that 'but for' causation . . . has been shown: the plaintiff would not have been harmed had his rights not been violated by the defendant." *Id.* (quoting *Greene v. Doruff*, 660 F.3d 975, 979 (7th Cir. 2011)).

### 1. *Protected First Amendment Activity*

Defendants concede that "Cecil has a constitutional right to be free from retaliation for filing lawsuits against NRVRJ officers," but argue that he "does not have a constitutional right to assist other inmates with legal issues." (Dkt. No. 29 at 8.) Cecil argues that he was engaged in protected First Amendment activity when he provided legal assistance to other inmates. (Dkt. No. 32 at 4–5.) The Court is persuaded by Cecil's arguments.

The Supreme Court has "maintained that the constitutional rights that prisoners possess are more limited in scope than the constitutional rights held by individuals in society at large." *Shaw v. Murphy*, 532 U.S. 223, 229 (2001). "In the First Amendment context, [] some rights are

8

simply inconsistent with the status of a prisoner or 'with the legitimate penological objectives of the corrections system.'" *Id.* (quoting *Pell v. Procunier*, 417 U.S. 817, 822 (1974)). Thus, the Court has "sustained proscriptions o[n] media interviews with individual inmates, prohibitions on the activities of a prisoners' labor union, and restrictions on inmate-to-inmate written correspondence." *Id.* (citing *Turner v. Safley*, 482 U.S. 78, 93 (1987); *Jones v. North Carolina Prisoners' Labor Union, Inc.*, 433 U.S. 119, 139 (1977); *Pell*, 417 U.S. at 89). On the other hand, the "Court has determined that incarceration does not divest prisoners of all constitutional protections [and] [i]nmates retain . . . certain protections of the First Amendment." *Id.* at 228–229.

"[W]hen a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Turner*, 482 U.S. at 89. In determining the reasonableness of a prison regulation that limits a constitutional right, courts consider whether: (1) there is a valid, rational connection between the prison regulation and the legitimate, neutral governmental interest put forward to justify it; (2) there are alternative means of exercising the right that remain open to prison inmates; (3) there is an impact on prison guards or other inmates in accommodating the asserted constitutional right; and (4) there are alternatives to the regulation that do not impinge on the constitutional right. *Id.* at 89–91. Although the Supreme Court has declined to provide jailhouse lawyering with "any First Amendment protection above and beyond the protection normally accorded prisoners' speech," a prohibition on jailhouse lawyering would be evaluated under the test set out in *Turner*. *Shaw*, 532 U.S. at 232.

Some circuits have held that jailhouse lawyering may be protected first amendment conduct. The Sixth Circuit has held that providing legal assistance to other inmates is protected

9

first amendment conduct where such "assistance [i]s necessary for other inmates to access the courts." *Berkshire v. Beauvais*, 928 F.3d 520, 531 (6th Cir. 2019) (quoting *King v. Zamiara*, 150 F. App'x 485, 492 (6th Cir. 2005) (citing *Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999) (reasoning that "a jailhouse lawyer's right to assist another prisoner is wholly derivative of that prisoner's right of access to the courts"))). The Eleventh Circuit has held that some "instance[s] of prison writ writing can be said to lie at the core of first amendment protected activities," "even if they are undertaken on behalf of others." *Adams v. James*, 784 F.2d 1077, 1082–83 (11th Cir. 1986). Further, the Eleventh Circuit noted that "[a] properly stated first amendment claim by an inmate does not fail simply because the allegedly protected activities were conducted on behalf of others[;] . . . the right of free expression is cherished for its force as an agent of social change and not only as a right of self-interested individuals." *Id.* at 1081. Similarly, the Second Circuit has held that "retaliation against a prisoner for filing or voicing grievances on behalf of a prison population as a member of an inmate grievance body . . . violates the right to petition government for the redress of grievances guaranteed by the First and Fourteenth Amendments." *Dolan v. Connolly*, 794 F.3d 290, 295 (2d Cir. 2015) (citing *Graham v. Henderson*, 89 F.3d 75, 80 (2d Cir. 1996)).

Although the Fourth Circuit has not addressed the issue of retaliation against jailhouse lawyers, it "has long held that prison officials may not retaliate against prisoners for exercising their right to access the courts, which is a component of the right to petition for redress of grievances." *Booker v. S.C. Dep't of Corr.*, 855 F.3d 533, 544 (4th Cir. 2017) (citing *Hudson v. Palmer*, 468 U.S. 517, 523 (1984); *Hudspeth v. Figgins*, 584 F.2d 1345, 1348 (4th Cir. 1978)). In *Booker v. S.C. Dep't of Corr.*, the Fourth Circuit held that "an inmate's First Amendment right to be free from retaliation for filing a grievance was clearly established." 855 F.3d at 546. The

court recognized its earlier decision in *Adams v. Rice*, 40 F.3d 72, 75 (4th Cir. 1994), in which it concluded that an inmate does not have a constitutional right to a grievance procedure. Nevertheless, the court explained that "*Adams* is entirely silent on . . . whether an inmate's First Amendment right is violated when he is *retaliated against* for submitting a grievance pursuant to an existing grievance procedure." *Booker*, 855 F.3d at 541. "That a prison is not required under the Constitution to provide access to a grievance process does not mean that prison officials who retaliate against inmates for filing grievances do not violate the Constitution." *Id.*

The court's reasoning in *Booker* is applicable here. That a prison is not required under the Constitution to allow an inmate to be a jailhouse lawyer "does not mean that prison officials who retaliate against inmates for [jailhouse lawyering] . . . do not violate the Constitution." *Id.* In other words, even if an inmate does not have an independent constitutional right to provide legal assistance to fellow inmates, the provision of legal assistance may still be protected first amendment conduct in certain circumstances. Notably, defendants do not argue that Cecil violated any NRVRJ regulation on jailhouse lawyering. In addition, Cecil argues that the legal assistance he provided to Cooper and Parish was essential for their access to the courts, given Cooper's limited education and Parish's mental health issues. (Dkt. No. 32 at 4–5.) Therefore, Cecil has pled facts sufficient to conclude that he was engaged in protected first amendment activity not only when he filed lawsuits and grievances on his own behalf, but also when he provided legal assistance to other inmates.

### 2. *Defendants Actions*

To state a claim of First Amendment retaliation, Cecil must show that each defendant took some action that adversely affected his first amendment rights. Because the parties agreed

11

to dismiss defendants Fleeman and Palmer, the remaining defendants are Superintendent Winston, Deputy Superintendent Bowman, Captain Bobbit, and Sergeant Jones.

### *i. Superintendent Winston*

"In order to establish supervisory liability under § 1983, a plaintiff must show: '(1) that the supervisor had actual or constructive knowledge that [his] subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to citizens like the plaintiff; (2) that the supervisor's response to that knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices[ ]; and (3) that there was an affirmative causal link between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff." *Pratt-Miller v. Arthur*, 701 F. App'x 191, 193 (4th Cir. 2017) (quoting *Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994)). "To demonstrate that a risk is pervasive and unreasonable 'requires evidence that the conduct is widespread, or at least has been used on several different occasions and that the conduct engaged in by the subordinate poses an unreasonable risk of harm of constitutional injury.'" *Id.* "In addition, a 'plaintiff assumes a heavy burden of proof in establishing deliberate indifference,' and must demonstrate a supervisor's continued inaction in the face of documented and widespread abuses." *Id.*

It is not alleged that Superintendent Winston personally retaliated against Cecil. Therefore, Cecil must plead all elements of supervisory liability to have a successful claim against Winston. Superintendent Winston had knowledge that Cecil believed he was retaliated against for exercising his First Amendment rights because Cecil informed Winston of this alleged retaliation in a letter dated May 29, 2020. (Ex. 10 at 26, Dkt. No. 3-1.) However, the May 29th letter does not indicate that the alleged retaliatory conduct of Bowman, Bobbit, Jones, or any other subordinates was widespread or occurred on several different occasions. Moreover,

there is no evidence that First Amendment retaliation was widespread in the NRVRJ. Therefore, Cecil does not adequately plead a claim of supervisory liability against Superintendent Winston. The court will grant the defendants' motion to dismiss as to Winston.

### ii. Captain Bobbit

Cecil claims that Captain "Bobbitt denied [] Cecil access to a grievance form stating that 'classification is not grievable' . . . [even though] Cecil stated with clarity 'I am grieving retaliation, not classification.'" (Dkt. No. 27 at 17.) Cecil further claims that, upon asking Captain Bobbit to be placed in a different pod, Bobbitt informed Cecil that he was not on restrictive housing and he could move to D-107, which is another segregation pod. (*Id.*)

Although an inmate is not entitled to access to a grievance procedure, an inmate is entitled to be free from retaliation for filing grievances. *See Booker*, 855 F.3d at 541. In this case, there is no allegation that Captain Bobbit denied Cecil a grievance form as retaliation for first amendment conduct. In addition, there is no allegation that Bobbit place Cecil in segregated housing or otherwise retaliated against him for protected conduct. Therefore, the court will grant the motion to dismiss as to Captain Bobbit.

### iii. Deputy Superintendent Bowman

Cecil alleges that on March 16, 2020, Deputy Superintendent Bowman threatened to move him to "harsher living conditions" if he continued to pursue the grievance procedure to address his claim of First Amendment retaliation. (Dkt. No. 27 at 14.) Cecil terminated the grievance process based on this threat. (*Id.*) Two months later, Cecil was moved from D-109 to D-110, an isolation pod. (*Id.*) When Cecil asked why he was moved, he was informed that it was Bowman's decision. (*Id.* at 14–15.) Bowman was aware of Cecil's civil suits and legal assistance to inmates because he was a defendant in the suit Cecil filed regarding access to

healthcare and he received a letter from Cecil regarding Cooper's § 1983 claim. (*Id.* at 10, 12.) Cecil sufficiently pled that Bowman took some action that adversely affected Cecil's first amendment rights.

### iv. Sergeant Jones

Cecil alleges that after he was moved to D-110, the isolation pod, Sergeant Jones approached him and said, "I bet you won't file any more lawsuits will you." (Dkt. No. 27 at 15.) However, Jones also said that he would put Cecil in general population if it were Jones' decision, "but he has bosses that tell him what to do." (*Id.*) Sergeant Jones also told Cecil that "housing assignment is an administrative decision." (*Id.*) Nevertheless, Cecil argues that housing assignment was a specific part of Jones' job at the NRVRJ. (*Id.*) Cecil also claims that Sergeant Jones told him he was not in restrictive housing and he could move to D-107, another segregation pod. (*Id.* at 17.) Whether Sergeant Jones took some action in retaliation to Cecil's first amendment conduct is a close question. Sergeant Jones did not physically move Cecil to restrictive housing, and he suggested that he did not personally make the decision to move Cecil. Nevertheless, Cecil has alleged that Jones is the individual at the NRVRJ responsible for housing assignments and Jones made statements suggesting Cecil was moved to restrictive housing because he filed lawsuits. Therefore, Cecil has adequately pled that Jones took some action adverse to his first amendment rights which is sufficient to survive the motion to dismiss.

### 3. Causal Relationship

Finally, Cecil must allege that there was a causal relationship between his protected first amendment activity and the defendants' conduct. "In order to establish this causal connection, a plaintiff in a retaliation case must show, at the very least, that the defendant was aware of her engaging in protected activity." *Constantine v. Rectors & Visitors of George Mason Univ.*, 411

14

F.3d 474, 501 (4th Cir. 2005) (citing *Dowe v. Total Action Against Poverty in Roanoke Valley*, 145 F.3d 653, 657 (4th Cir. 1998)). "'Knowledge alone, however, does not establish a causal connection' between the protected activity and the adverse action." *Id.* (quoting *Price v. Thompson*, 380 F.3d 209, 213 (4th Cir. 2004)). "There must also be some degree of temporal proximity to suggest a causal connection." *Id.* "'A lengthy time lapse between the [public official's] becoming aware of the protected activity and the alleged adverse . . . action . . . negates any inference that a causal connection exists between the two.'" *Id.* (quoting *Dowe*, 145 F.3d at 657) (noting that up to a nine-month lapse between the protected conduct and the retaliatory action is likely sufficient to survive a motion to dismiss).

Here, Cecil has sufficiently pled that he was placed in restrictive housing due to filing lawsuits, using the grievance process, and assisting other inmates with legal matters. Deputy Superintendent Bowman was aware of Cecil's First Amendment conduct because he was a defendant in one of the lawsuits Cecil filed. (*Id.* at 10.) In addition, Bowman was the recipient of a letter that Cecil helped another inmate write regarding a § 1983 claim and Bowman threated Cecil with harsher living conditions if he continued to use the grievance process. (*Id.* 12, 14.) Moreover, Cecil has shown that Sergeant Jones was also aware of Cecil's first amendment conduct because he stated, "bet you won't file any more lawsuits will you." (Dkt. No. 27 at 15.) The temporal proximity between Cecil's first amendment conduct and his move to segregation, then isolation, suggests a causal connection may exist between the two events. Cecil filed a lawsuit against Bowman in January 2020 and helped inmate Parish file a lawsuit on March 2, 2020. Just two days later, on March 4, 2020, Cecil was moved to segregated housing. (Dkt. No. 27 at 12–13.) Similarly, Cecil spoke with Bowman about accessing the grievance process to make a complaint of first amendment retaliation in March 2020, and two months later, in May

15

2020, he was moved to an isolation pod.  (*Id.* at 14.)  The statements by Deputy Superintendent Bowman and Sergeant Jones and the temporal connection between Cecil's protected first amendment conduct and his placement in segregated and isolated housing sufficiently allege a causal connection.

### III.  CONCLUSION

For the reasons stated above, the defendants' motion to dismiss will be dismissed as moot as to Fleeman and Palmer, denied as to Bowman and Jones, and granted as to Winston and Bobbit.  An appropriate order will follow.

Entered: August 17, 2021

/s/ Elizabeth K. Dillon
United States District Judge