IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

JAMES LEE CECIL, JR.             )
                                      )
      Plaintiff,               )
                                      )
v.                              )       Civil Action No. 7:20-cv-00349
                                      )
JOHN BOWMAN and            )       By: Elizabeth K. Dillon
KEVIN JONES,               )          United States District Judge
                                      )
      Defendants.            )

**MEMORANDUM OPINION**

James Lee Cecil, Jr, a former inmate at the New River Valley Regional Jail ("NRVRJ"), filed this action pursuant to 42 U.S.C. § 1983, alleging that the defendants placed him in segregated housing in retaliation for using his paralegal training to assist other inmates with their legal claims and then threatened him with harsher living conditions if he used the grievance process or filed additional lawsuits, all in violation of his First Amendment rights.

Pending before the court is defendants' motion for summary judgment (Dkt. No. 61), which is now ripe for resolution. Because Cecil failed to exhaust his administrative remedies, the motion will be granted and Cecil's complaint will be dismissed with prejudice.

I.  BACKGROUND

**A.  Cecil's Housing Reassignment**

Cecil was an inmate at the NRVRJ from November 4, 2019, to January 25, 2021. At all times relevant to this action, defendant John Bowman was the Deputy Superintendent at NRVRJ, and defendant Kevin Jones was a sergeant at NRVRJ who also led the Classification Department and served as the Classifications Supervisor.

1

Upon booking at NRVRJ,[1] Cecil was classified as a minimum-security inmate; he was initially housed with minimum-security inmates in pod F-103—a least-restrictive general-population housing pod within an area known as "F-block."  However, in March 2020, Superintendent Gregory Winston directed Bowman to change Cecil's housing assignment to a pod in "D-block."  Bowman then contacted Jones and asked him to rehouse Cecil in either pod D-107 or D-109.  On March 4, 2020, Jones coordinated with NRVRJ officers to reassign Cecil from pod F-103 to pod D-109.  Cecil insists that "D-block" is segregated housing and is known to other inmates as the "sex offender pod" (Dkt. No. 79 at 7, 9), but defendants maintain that D-109 was simply another least-restrictive general-population pod for high-risk inmates (i.e., inmates who are at a higher risk of being assaulted or assaulting other inmates) and that Cecil kept the same privileges in pod D-109 that he had in pod F-103 (Dkt. No. 64 at 5).[2]

Cecil claims that defendants changed his housing (and—he insists—his classification) as retaliation in response to his paralegal work[3] helping other inmates with their legal complaints against NRVRJ from December 2019 to March 2020.  For example, according to Cecil, in December 2019, he assisted a fellow inmate—Daniel Allen Cooper Jr.—with filling out and filing a Section 1983 form and with writing a letter to be sent to Bowman that included a copy of

---

[1] At his deposition, Cecil testified that, while being booked, his law books were confiscated and that the booking officer told him that the NRVRJ administration "doesn't like jailhouse lawyers."  (Dkt. No. 79-1 at 11 (Cecil Dep. 44:16–25).)

[2] Although the parties genuinely dispute whether pod D-109 was operated as segregated housing (among other factual discrepancies), that dispute does not preclude summary judgment because it is immaterial to whether Cecil properly exhausted administrative remedies, which is the basis upon which the court will grant summary judgment.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) ("Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."); *AIU N. Am., Inc. v. Caisse Franco Neerlandaise de Cautionnements*, 72 F. Supp. 2d 350, 353 (S.D.N.Y. 1999) ("[T]he mere existence of a factual dispute between parties does not preclude summary judgment . . . when the disputed facts are immaterial. A disputed fact is immaterial when the outcome of the case remains the same regardless of the disputed issue.").

[3] Cecil asserts that he received his paralegal/legal assistant certificate from Blackstone Career Institute in January 2020. (*See, e.g.*, Dkt. No. 79 at 6.)

2

the form.  (*See* Dkt. No. 79-1 at 66–67.)  Additionally, Cecil claims to have assisted another

inmate, Jackson Ellis Parrish, with filing a state civil action challenging the NRVRJ's alleged

refusal to provide Parrish depression medication that had already been prescribed to him.  (*See*

*id.* 71–76.)  Two days after assisting Parrish with his legal complaint, Cecil was ordered to pack

up his belongings and move to pod D-109.  On the other hand, defendants maintain that Cecil

was moved to pod D-109 due to his involvement in several disciplinary incidents occurring in

February 2020 (the occurrence of which Cecil does not dispute)[4] and that, due to the NRVRJ's

command structure, neither of them had the authority to disobey the direct order from

Superintendent Winston regarding Cecil's housing reassignment.

**B.  Initial Grievance Proceedings**

On March 5, 2020, Cecil submitted an inmate request form to NRVRJ personnel

requesting a grievance form; he stated that he was "told by a Correctional Officer that the reason

that I was moved from F103 to D109 is because the administration is 'getting back at me' or

retaliating against me for filing lawsuits."  (Dkt. No. 64-12.)  Cecil received an Informal

Grievance Complaint Form, which he completed and submitted on March 6, 2020.  (Dkt. No. 64-

13.)  In his grievance, Cecil alleged that the reason he was reassigned from pod F-103 to pod D-

109 (the latter of which he claimed was "Maximum Security housing") was because of his

"pending lawsuits," noting that he was removed from his housing in F-block "after the filing of

civil actions without justification."  (*Id.*)  Cecil asked that he be returned to his original housing

assignment and that NRVRJ provide an explanation for why he was (allegedly) reclassified

because, in his words, "the timing of my reclassification and the serving of the civil actions

randomly match up with each other . . . ."  (*Id.*)

---

[4] *Compare* Dkt. No. 64 at 3–4 (describing three disciplinary incidents) *with* Dkt. No. 79 at 14 (finding "undisputed" the portions of defendants' brief describing those incidents).

On March 9, 2020, Major Keith Fleeman responded to Cecil's grievance, stating that housing is not a grievable issue.  (Dkt. No. 64-13.)  In addition, Major Fleeman informed Cecil that if he disagreed with his classification status or housing assignment, he could appeal that decision (and then directed Cecil to the applicable section of the NRVRJ's Inmate Handbook). (*Id*.)  Cecil indicated on the form that he was "not satisfied" with Major Fleeman's response, writing, "I am not grieving the housing issue, I am grieving the timing of the re-classification pursuant to this facility being served with civil actions."  (*Id*.)[5]  Cecil then sought to appeal what he believed was a classification transfer pursuant to the Inmate Handbook (*see* Dkt. No. 79-1 at 34), but he maintains that "[his] appeal was never returned, and no judgment was rendered."[6] (Dkt. No. 79 at 8.)

Having not been resolved at the informal resolution stage, Cecil's informal grievance was elevated to a formal grievance per NRVRJ policy.  Upon reviewing Cecil's grievance, Bowman concluded that the issue presented in the grievance was grievable, but without merit; in his March 16, 2020 written response to Cecil, Bowman stated that "[y]our housing has nothing to do with your lawsuit. You have all privileges as your prior housing."  (Dkt. No. 64-15.)  Bowman then personally met with Cecil, as he did with all inmates who filed formal grievances, in the hallway outside of pod D-109 that circulates the D-block control room, in front of the command center attending officer, to discuss the grievance and his response.  (Dkt. No. 64-1 at 4.)  They discussed why Cecil had been moved from one general housing unit to another general housing unit and that he maintained all the same privileges as before—for example, the ability to order

---

[5]  Although Cecil insisted that his grievance was not challenging his housing, his remedial request was, indeed, to be returned "back to my original housing."  (Dkt. No. 64-13.)

[6]  However, for reasons explained herein, Cecil did not follow the proper procedure to appeal a decision regarding his custody status/housing assignment.

4

canteen, talk on the phone, watch TV, and go to recreation.  (*Id*.)  At the end of the discussion,

Cecil filled out the inmate response section of the formal grievance complaint form (which

appears directly below Bowman's written response); Cecil wrote a check mark in the space

labeled "I am **Satisfied**," wrote a check mark in the space labeled "I Wish to **Terminate this**

**Grievance**," and signed his name at the bottom of the form with the date and time.  (Dkt. No.

64-15 (emphasis in original).)

According to Cecil, during this discussion, Bowman asserted that, if Cecil did not like his

housing assignment in pod D-109, Bowman "could make it harder on [him] or he would make it

harder on [him]"; Cecil understood this statement to be a threat that Bowman would "make it

harder" on him if he did not withdraw the pending grievance.  (*See* Dkt. No. 79-1 at 19–20 (Cecil

Dep. 94:20–95–20).)  Bowman, on the other hand, denies having made such a statement.[7]

Cecil did not appeal Bowman's decision, and the grievance process as to that grievance

concluded.  Cecil asserts that he chose not to appeal that decision because he did not want

Bowman to "make it harder" on him.  (Dkt. No. 79-1 at 23–24 (Cecil Dep. 98:16–99:20).)

## C.  Further Disciplinary Incidents, Reclassification as a Maximum-Security Inmate, and Subsequent Grievance Proceedings

On April 30, 2020, after a classification reassessment, Cecil was classified as a

maximum-security inmate; on May 15, 2020, his cell assignment was changed from pod D-109

to a pre-hearing restrictive housing cell in pod D-110.  Defendants represent that Cecil was re-

classified—and his cell assignment was changed—due to multiple in-house disciplinary charges

and infractions that he received after being moved to pod D-109.  However, Cecil professes that

---

[7] *See* Dkt. No. 64-1 at 5 (sworn statement from Bowman that he "did not threaten" Cecil during the meeting or at any other time, and that he "did not make any statement or take any action that could reasonably imply that [Cecil] would incur punishment for pursuing the grievance procedure or engaging in filing civil actions on behalf of himself or others").

he was moved for the same retaliatory reasons that allegedly caused his initial move to D-109. According to Cecil, on May 29, 2020, Sergeant Jones approached him and said "I bet you won't file any more lawsuits will you";[8] Jones denies having made that statement.  (*See* Dkt. No. 64-7 at 2.)

On May 23, 2023, Cecil submitted another inmate request form regarding alleged retaliation in moving him to pod D-110.  He claimed that he was "being housed in a side pocket which has no table, desk, [or] TV." (*See* Dkt. No. 79-1 at 104.)  He further asserted that "[a]ll other inmates go through a classification process" but that "[e]very time I ask to be placed in population, Officer Hamilton, Sgt[.] Jones, and all other employees say they can't classify me because it's above their head" and that "[t]hey all say it's John Bowman's fault." (*Id.*)  Captain Thomas Bobbit responded the same day, informing Cecil that he was "moved to D-110 because a safety issue was identified based on 2 incidents from D-109 that had to be investigated," that "D-110 is not a isolation (23 hr Lockdown) housing unit," that he was moved for "safety and investigative reasons," that "[o]nce the investigation is complete, [he] will be reevaluated and moved if necessary," and that "[h]ousing assignments are not grievable." (*Id.*)

Cecil does not allege that he continued to pursue the grievance procedure as to this issue; instead, on May 29, 2020, he wrote a letter to Superintendent Winston, but never received a reply.  (Dkt. No. 79-1 at 106–07.)

## D.  Plaintiff's Claims

Cecil filed this action (initially pro se) on June 18, 2020 (Dkt. No. 1), and, after amending twice, filed the current version of the complaint on December 9, 2020 (Dkt. No. 27).  Cecil originally named Bowman, Jones, Winston, Fleeman, Bobbit, and Sergeant Arthur Palmer as

---

[8] However, Cecil does not cite to any record evidentiary support for the proposition that Jones made this statement.  (*See* Dkt. No. 79 at 9–10.)

defendants.  (*Id.*)  However, upon defendants' motion to dismiss, the parties agreed to dismiss

the claims against Fleeman and Palmer, and the court then granted the motion to dismiss as to

Winston and Bobbit.

Bowman and Jones now move for summary judgment.  (Dkt. No. 61.)

## II.  DISCUSSION

### A.  Standard of Review

Summary judgment is appropriate where "the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.

R. Civ. P. 56(a).  The party seeking summary judgment "bears the initial responsibility of

informing the district court of the basis for its motion, and identifying those portions of [the

record] which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex*

*Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Once the moving party has met its burden, the non-

moving party must then "come forward with 'specific facts showing that there is a genuine issue

for trial.'"  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting

Fed. R. Civ. P. 56(e)).  "Only disputes over facts that might affect the outcome of the suit under

the governing law will properly preclude the entry of summary judgment."  *Anderson v. Liberty*

*Lobby, Inc.*, 477 U.S. 242, 248 (1986).  If the evidence of a genuine issue of material fact "is

merely colorable or is not significantly probative, summary judgment may be granted."  *Id.* at

249–50 (internal citations omitted).

In determining whether there is a genuine issue for trial, "[t]he evidence of the non-

movant is to be believed, and all justifiable inferences are to be drawn in [its] favor."  *Id.* at 255.

But "permissible inferences must still be within the range of reasonable probability" and "it is

the duty of the court to withdraw the case from the jury when the necessary inference is so

tenuous that it rests merely upon speculation and conjecture."  *Lovelace v. Sherwin-Williams*

*Co.*, 681 F.2d 230, 241 (4th Cir. 1982) (quotations and alteration omitted).  Thus, summary

judgment is warranted where "the verdict in favor of the non-moving party would *necessarily* be

based on speculation and conjecture."  *Myrick v. Prime Ins. Syndicate, Inc.*, 395 F.3d 485, 489

(4th Cir. 2005) (emphasis added).  By contrast, where "the evidence as a whole is susceptible of

more than one reasonable inference, a jury issue is created," and summary judgment should be

denied.  *Id.* at 489–90.

## B.  Concession As To Defendant Kevin Jones

In his response brief, Cecil notes that "[t]he only remaining Defendant in this case is John

Bowman, based upon the evidence reviewed by Plaintiff."  (Dkt. No. 79 at 1 n.1.)  The court

interprets this remark as a concession that the evidentiary record does not support a First

Amendment retaliation claim against Jones.  As such, the court will grant Jones' motion for

summary judgment and dismiss the claim against him with prejudice.[9]

## C.  Exhaustion of Administrative Remedies—Defendant John Bowman

In moving for summary judgment, Bowman argues that Cecil's First Amendment claim

must be dismissed because he failed to exhaust administrative remedies through the grievance

process at NRVRJ.

The Prison Litigation Reform Act ("PLRA") requires a prisoner-plaintiff to exhaust his

available administrative remedies prior to bringing suit.  42 U.S.C. § 1997e(a).[10]  "[E]xhaustion

---

[9] But even if Cecil did not intend to concede that the evidence against Jones is insufficient to support a First Amendment claim against him, that claim would nevertheless be subject to dismissal because of Cecil's failure to exhaust administrative remedies.

[10] Although Cecil is no longer an inmate at NRVRJ (and thus is not currently "incarcerated or detained" within the meaning of the PLRA), the exhaustion requirement nevertheless applies to his claims.  "[I]t is the plaintiff's status *at the time he filed the lawsuit* that is determinative as to whether the § 1997e(a) exhaustion requirement applies."  *Cofield v. Bowser*, 247 F. App'x 413, 414 (4th Cir. 2007) (emphasis added).  Here, Cecil was still an inmate at NRVRJ at the time he filed this suit, so "the administrative exhaustion requirement under the PLRA continues to apply" despite his release.  *Chase v. Peay*, 286 F. Supp. 2d 523, 527 (D. Md. 2003) (citing cases), *aff'd*, 98 F. App'x 253 (4th Cir. 2004).

is mandatory under the PLRA and . . . unexhausted claims cannot be brought in court." *Jones v. Bock*, 549 U.S. 199, 211 (2007).  Moreover, *proper* exhaustion of remedies is required, which means that the inmate "must follow each step of the established administrative procedure that the facility provides to prisoners and meet all deadlines within that procedure" before filing a § 1983 action. *Thompson v. Clarke*, No. 7:17-cv-00010, 2018 WL 1955424, at *11 (W.D. Va. Apr. 25, 2018) (citing *Woodford v. Ngo*, 548 U.S. 81, 90–94 (2006)).  A court may not "excuse a failure to exhaust." *Ross v. Blake*, 578 U.S. 632, 639 (2016).

A prison official has the burden to prove an inmate's failure to exhaust available administrative remedies. *Jones*, 549 U.S. at 216.  Once a defendant presents evidence of a failure to exhaust, the burden of proof shifts to the inmate to show, by a preponderance of the evidence, either that exhaustion occurred or that administrative remedies were unavailable. *Tuckel v. Grover*, 660 F.3d 1249, 1254 (10th Cir. 2011); *Graham v. Gentry*, 413 F. App'x 660, 663 (4th Cir. 2011).

### 1. Bowman has demonstrated that Cecil did not follow NRVRJ's established administrative procedure.

In support of the motion for summary judgment, Bowman provided a declaration which, among other representations, outlined NRVRJ's formal and informal grievance process (Dkt. No. 64-1); both parties also provided copies of the portion of NRVRJ's Inmate Handbook that covers inmate grievances (Dkt. No. 64-14; Dkt. No. 79-1 at 50–59).  An inmate at the NRVRJ who wishes to submit a grievance must first request an informal grievance complaint form by completing an inmate request form.  Shortly after receiving the request form, a shift commander will then (1) determine if the complaint is "grievable," "grievable but frivolous," or "non grievable," (2) provide the complainant with the informal grievance complaint form, (3) discuss the complaint with the complainant and attempt to resolve the alleged problem, and, finally, (4)

9

enter the resolution in writing on the informal grievance complaint form and discuss the response with the complainant.  If the complainant is satisfied with the response/resolution, he or she will check off the section of the form labeled "I am **Satisfied**" and sign it.  At this point, the procedure ends.  However, if the complainant is not satisfied, he or she will check off the section labeled "I am **Not Satisfied**," state the reasons for dissatisfaction, sign the form, and return it to the shift commander.  At this point, the grievance will be elevated to a formal grievance.

The first step of the formal grievance resolution stage requires the Deputy Superintendent—which, during the period in question, was Bowman—to (1) determine whether the complaint is "grievable," "grievable but frivolous," or "non grievable," (2) respond in writing of his or her decision to the complainant, and (3) enter the written response on the original formal inmate grievance form and sign it.  As with the informal grievance, if the complainant is satisfied, then he or she will check of the section labeled "I am **Satisfied**," which will end the procedure.  Otherwise, he or she will check off the section for "I am **Not Satisfied**," and may then either terminate the process at this point or appeal the Deputy Superintendent's decision to the Superintendent.  The Superintendent would then engage in substantially the same process in the final level of review.

With respect to Cecil's first grievance regarding alleged retaliation in his transfer to pod D-109, neither party disputes the following: on March 5, 2020, Cecil submitted an inmate request form to NRVRJ personnel (Dkt. No. 64-12); shortly thereafter, he received an informal grievance complaint form, which he completed and submitted the next day (Dkt. No. 64-13).  On March 9, Major Fleeman responded to inform Cecil that his complaint was a non-grievable issue and directed Cecil to the applicable section of the Inmate Handbook regarding appeals.  (*Id.*)  On the informal grievance complaint form, Cecil indicated he was not satisfied with Major

Freeman's response by checking off the section labeled "Not Satisfied."  (*Id.*)  Then, on March

16, Bowman received and reviewed Cecil's formal grievance and concluded that it was without

merit.  (Dkt. No. 64-15.)  Later that afternoon, Bowman met with Cecil to discuss his response to

the grievance, after which Cecil checked off the section labeled "I am **Satisfied**," signed his

name (as well as the date and time), and checked off the section indicating that he wished to

"**Terminate this Grievance**."[11]  (*Id.* (emphasis in original).)

With respect to any claim that Bowman violated Cecil's First Amendment rights by

placing him in pod D-109 in retaliation for using his paralegal training to assist other inmates

with their legal claims, the undisputed factual record makes clear that Cecil pursued the

grievance process and ultimately terminated that process after indicating that he was "satisfied"

with Bowman's resolution of the grievance.  Moreover, with respect to any claim that Bowman

deprived Cecil of his First Amendment rights by allegedly threatening to make life harder for

him if he refused to withdraw that grievance, the NRVRJ Inmate Handbook explicitly provides

for a separate "Reprisal Recourse Procedure"[12] for situations in which an inmate "feels that any

member of the jail staff is retaliating against him" for filing a grievance or "if for any reason the

inmate feels that he [] is being unfairly singled out in a retaliatory manner by a member of the

jail staff."  (Dkt. No. 64-14 at 2.)  Under the Handbook, an inmate so situated may submit a

___

[11]  Cecil has also alleged that Bowman made threatening statements during this meeting that caused him to terminate the grievance appeal process.  But as explained below, even if Bowman did make such a threatening statement, other undisputed facts in the record nevertheless demonstrate that Cecil failed to follow NRVRJ's established administrative process for situations in which the inmate believes a jail employee is retaliating against him; thus, he did not fully exhaust available administrative remedies.

[12]  The Handbook defines "reprisal" as "any overt or subtle act with the intent to retaliate or vindicate, either physically or mentally, by any member of the jail staff, against any inmate or staff member as the result of the good faith employment of the grievance/response procedure, the good faith participation in the grievance/response procedure, or against any inmate or Staff member in a retaliatory or vindictive manner."  (Dkt. No. 64-14 at 2.)

11

written request to the Director of Security.  (*Id.*)  Cecil never filed such a request or otherwise

availed himself of this process.

Cecil did attempt to appeal the determination of his classification status, but he did not

follow the correct procedure for doing so.  According to the Inmate Handbook, an inmate who

disagrees with his custody status and/or housing assignment may appeal that decision of the

Classification Department by submitting an Inmate Request Slip to the Classification

Department, requesting a Classification Appeal Form; that form must then be submitted by the

inmate to the Deputy Superintendent within seven days of the custody/housing decision.  (Dkt.

No. 79-1 at 34.)  However, Cecil did not do that.  Instead, he sent a letter (not an Inmate Request

Slip) directly to the Deputy Superintendent (not to the Classification Department).  By

incorrectly following NRVRJ's grievance procedure, Cecil failed to exhaust administrative

remedies as to that matter.

Lastly, regarding Cecil's final grievance alleging retaliation in his move from pod D-109

to pod D-110 and re-classification as a maximum-security inmate, Cecil did submit an inmate

request form; however, nothing in the evidentiary records demonstrates that he pursued the

process past that point by filing an informal or formal grievance.  Instead, he wrote a letter

directly to Superintendent Winston outside the grievance process—which, again, does not suffice

as proper exhaustion.

Given the above, Bowman has met his burden of establishing that Cecil failed to exhaust

all administrative remedies.

## 2. Cecil has not demonstrated that administrative remedies were unavailable to him.

The burden now shifts to Cecil to prove, by a preponderance of the evidence, that exhaustion occurred or that administrative remedies were unavailable to him. *Ross*, 578 U.S. at 644; *Graham*, 413 F. App'x at 663.

An inmate need only exhaust "available" remedies. 42 U.S.C. § 1997e(a). An administrative remedy is not available "if a prisoner, through no fault of his own, was prevented from availing himself of it." *Moore v. Bennette*, 517 F.3d 717, 725 (4th Cir. 2008). An inmate must exhaust "only those [] grievance procedures that are capable of use to obtain some relief for the action complained of." *Ross*, 578 U.S. at 642 (internal quotations omitted). An administrative remedy is considered unavailable when: (1) "it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates"; (2) it is "so opaque that it becomes, practically speaking, incapable of use;" or (3) "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id*. at 643–44.

In his brief, Cecil does not directly address defendants' exhaustion arguments. Of particular significance, Cecil never claims that he did in fact follow every step of NRVRJ's grievance process. However, because he does insist that the only reason he withdrew his initial grievance regarding his move to pod D-109 was because Bowman threatened to "make it harder" on him if he did not do so, the court will consider whether such a threat—assuming it was made—rendered administrative remedies unavailable to Cecil.

In determining whether alleged threats by any correctional officer rendered administrative remedies "unavailable," courts apply a two-part test from the Eleventh Circuit's decision in *Turner v. Burnside*, 541 F.3d 1077 (11th Cir. 2008), which has been adopted in

several other circuits.[13]  *See, e.g.*, *Lebron v. Anders*, No. 7:20-cv-00524, 2021 WL 4227770, at

*5 (W.D. Va. Sept. 16, 2021) (citing *Turner*, 541 F.3d at 1085); *Perdue v. Fisher*, No. 7:21-cv-

00239, 2023 WL 2405585, at *4 n.6 (W.D. Va. Mar. 8, 2023) (applying *Turner* test).  The test

requires an inmate to show: (1) *subjectively*, that "the threat actually did deter the plaintiff inmate

from lodging a grievance or pursuing a particular part of the process;" and (2) *objectively*, that

"the threat is one that would deter a reasonable inmate of ordinary firmness and fortitude from

lodging a grievance or pursuing the part of the grievance process that the inmate failed to

exhaust."  *Turner*, 541 F.3d at 1085.  The subjective element "ensures that the grievance process

was perceived as unavailable by this plaintiff," while the objective element "ensures that inmates

cannot easily circumvent the exhaustion requirement and thus only threats that are sufficiently

serious and retaliatory acts that are severe enough to deter a reasonable inmate will result in an

administrative remedy becoming unavailable for PLRA purposes."  *Rinaldi v. United States*, 904

F.3d 257, 268 (3d Cir. 2018) (internal quotations omitted).

Regardless of the objective severity of Bowman's alleged threat, though, Cecil's position

nevertheless fails on the subjective prong.  He testified at his deposition that it was this statement

that led him to withdraw his grievance[14] (though he also admitted that Bowman never directly

---

[13]  The Tenth Circuit, for example, has endorsed the "two-prong analysis in *Turner*" as "the best model" for the "showing necessary to defeat a failure-to-exhaust defense." *Tuckel v. Grover*, 660 F.3d 1249, 1253–54 (10th Cir. 2011); *see also McBride v. Lopez*, 807 F.3d 982, 987 (9th Cir. 2015); (embracing *Turner* as "straightforward and conceptually simple to apply"); *Rinaldi v. United States*, 904 F.3d 257, 268 (3d Cir. 2018) (finding the *Turner* test to be "a sensible one").

[14]  *See* Dkt. No. 79-1 at 18 (Cecil Dep. 93:15–22)

> Q: All right.  Now I understand, is it your testimony that you were influenced by what John Bowman told you during the conversation that made you write something on here in a certain way?
>
> A: The reason, that's why I withdraw the agreement [sic] is right there, is because he told me he could make it harder on me or he would make it harder on me.

referred to the grievance in that statement).[15]  Nevertheless, Cecil continued to file grievances on

other related matters shortly after his meeting with Bowman.  (*See* Dkt. No. 64-24; *see also*

*Pickens v. Lewis*, No. 1:15-cv-275-FDW, 2017 WL 3277121, at \*5 (W.D.N.C. Aug. 1, 2017)

(concluding that remedies were not unavailable, in part because the plaintiff submitted other

grievances during the relevant period).)  Additionally, as noted earlier, the NRVRJ Inmate

Handbook provides a "Reprisal Recourse Procedure" for precisely this sort of situation, and any

requests made pursuant to that procedure would be lodged with the Director of Security, not

Bowman.  Cecil offers no explanation for why he never put in such a request.  Lastly and most

notably, Cecil also filed *this lawsuit* while he was still housed at NRVRJ, "further undermining

any suggestion that he feared retaliation to a sufficient degree that he was thwarted from

exhausting his remedies."  *See Rodrigues v. Hamilton*, No. 7:20-cv-00338, 2021 WL 413530, at

\*6 (W.D. Va. Feb. 5, 2021).

Accordingly, the court finds that Cecil has not carried his burden of proving, by a

preponderance of the evidence, that administrative remedies were unavailable to him.

---

[15]  *See id.* 22 (Cecil Dep. 97:4–14) (emphasis added)

> MS. SHERMAN-STOLTZ: Was [Bowman's statement] exactly specifically
> related to the grievance? [Defense counsel] is asking was it specifically related
> to the grievance.
>
> THE WITNESS: No
>
> Ms. SHERMAN-STOLTZ: That you withdraw the grievance.
>
> THE WITNESS: *No. I don't think he said that. He didn't say that*.

15

## III.  CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment (Dkt. No. 61) will

be granted.  Because Cecil is no longer confined at NRVRJ, his complaint will be dismissed with

prejudice.[16]  An appropriate order will follow.

Entered: June 22, 2023.

/s/ Elizabeth K. Dillon

Elizabeth K. Dillon
United States District Judge

---

[16] *See Stephens v. Byrd*, No. 7:18-cv-00172, 2019 WL 4345378, at *4 (W.D. Va. Sept. 12, 2019)
(dismissing unexhausted equal-protection claim with prejudice because the plaintiff "[wa]s no longer confined at the
jail").